Sidney H. Asoh, J.
George Washington once observed that ‘ ‘ gambling is the child of avarice, the brother of iniquity and the father of mischief.” This case supports that proposition. The plaintiff seeks the amount of $44,517.90 based upon the outcome of the ninth race at Yonkers Raceway in March 18, 1972. Reflecting on the outcome, he may well have echoed the Damon Runyon horse bettor who said, ‘ ‘ The way my figures are standing up, I can run a spool of thread into a pair of pants in no time.” (Runyon, All Horse Players Die Broke). The defendant bookie, New York City Off-Track Betting Corporation, chilled his hopes by rejecting his claim, in effect advising him to: “ Call a lawyer and sue me, sue me what can you do me ” (Guys and Dolls, Swerling, Burrows and Loesser).
A superfecta race is a system of pari-mutuel betting in which the bettor must select the first, second, third and fourth place horses in their exact order of finish. In spite of the admonition of William Blake in his Auguries of Innocence, that “ The whore & Gambler, by the State Licence’d build that nations Fate,” New York City has plunged ahead and operates a string of horse parlors. Horses are designated at New York City Off-Track Betting Corporation (OTB) by letters and a wager is placed on a horse by selecting its designated letter.
On March 18, 1972, superfecta wagers on the ninth race at Yonkers Raceway were accepted on all horses, including the “I” horse, at all OTB branches throughout the city until approximately 10:00 a.m. and thereafter from approximately 4:30 until approximately 7:30 p.m. when all superfecta betting closed. In fact, 193 superfecta bets which included the “ I ” horse as one of the selections were placed at OTB.
Although no one bet the winning combination of E, G, A, I, at OTB, some persons who bet at the track did, and it appears that they each received a winning payoff of $44,517.90. It should be noted that for races held at tracks within the State, the wagers at OTB and the track are combined into one pari-mutuel pool and the pool is divided equally among the winners regardless of where the bet was placed. That was the procedure on this particular superfecta race.
Plaintiff’s basic allegations are that defendant offered a superfecta wager only on horses A through H and that consequently plaintiff placed two superfecta wagers, one on E, G, A, D and another on E, G, A, B.
The theory advanced by plaintiff in his first cause of action is that since OTB was not accepting bets on the “ I ” horse at *473 the precise time plaintiff placed his bet on E, G, A, D, the horse designated by the letter “ I ” should be disregarded in determining the winning superfecta for those who placed superfecta wagers at OTB. If this procedure were followed, plaintiff urges the winning superfecta should be E, G, A, D, since the horse designated by the letter “D ” came in fifth behind “I”.
The theory on which plaintiff bases his second and third causes of action is that his wagers on E, G, A, D and E, G, A, B should be regarded as being actually placed on E, G, A, I, and he should receive a winning payoff accordingly. To support this theory, plaintiff alleges that he intended to place both bets on E, G, A, I, but instead placed bets on E, G, A, D and E, G, A, B, because defendant would not accept bets which included the “ I ” horse at the time plaintiff made his wagers.
Assuming all the facts as alleged by plaintiff in his complaint were true, the complaint should be dismissed for failure to state a cause of action.
Plaintiff, by seeking in his first cause of action to have the court declare E, G, A, D the winner at OTB, would have the court disregard two important facts: (1) OTB accepted superfecta wagers which included the “ I ” horse from the time each branch office opened until approximately 10:00 a.m. and from approximately 4:30 p.m. until 7:30 p.m. when superfecta betting closed and (2) all the money wagered at OTB was combined with the track pool and was used to pay off the winners, all of whom placed their bets at the track.
The official operating procedures, rules and regulations promulgated by defendant provide in paragraph 2.11 that ‘1 in all cases OTBO pari-mutuel pool distribution shall be based upon the order of finish posted at the track as ‘ official ’ and upon which the track payoff is made.” The official order of finish posted at the track was that of horses designated by letters E, G, A, I.
In Salmore v. Empire City Racing Assn. (123 N. Y. S. 2d 688 [Sup. Ct., Kings County, 1953]), plaintiff objected to the method used by the track, to compute the payoff when horses finish in a dead heat because he was paid off at lower odds than those at which his horse ran, whereas those who bet on the other horse were paid off at the same odds at which that horse ran. This method of computation was prescribed by the rules and regulations of the track.
The court held that when a person places a bet, he is presumed to know the rules and his bet is subject to all the rules and regulations prescribed by the track and racing commission.
*474 Applying that decision to the instant case, the plaintiff is bound by the order of finish posted at the track and cannot collect a winning payoff by presenting a ticket which does not represent the selection of horses E, Gr, A, I in that order of finish.
In his second and third causes of action, plaintiff claims that he should recover on his two wagers (E, Gr, A, D and E, Gr, A, B) as though he placed them on E, Gr, A, I, because he intended to place them on E, Gr, A, I. These claims have no merit.
A winning ticket on the race in question is one which evidences a bet on horses E, Gr, A, I in that order of finish. Plaintiff alleges that his two tickets on their faces, represent bets on horses E, Gr, A, D and E, Gr, A, B. Thus by his own verified complaint, plaintiff admits that he is not in possession of a winning ticket.
Subdivision 1 of section 69-c of the New York State Off-Track Pari-Mutuel Betting Law (L. 1970, ch. 143, § 1, as amd.) mandates that ‘ ‘ all sums deposited in any off-track pari-mutuel pools shall be distributed to the holders of winning tickets therein ’ ’.
This same requirement in the Pari-Mutuel Revenue Law (L. 1940, ch. 254, § 1, as amd.) has been held to mean that a bettor must present a winning ticket before recovering payment of his share of the pari-mutuel pool. (Epps v. Yonkers Raceway, 21 A D 2d 798, 799 [2d Dept., 1964] where ticket was stolen; Carr v. State of New York, 15 A D 2d 709 [3d Dept., 1962] tickets accidentally destroyed; Aliano v. Westchester Racing Assn., 265 App. Div. 225 [2d Dept., 1942] ticket destroyed.)
Since plaintiff does not possess a winning ticket, he cannot recover payment of a winning share.
Plaintiff alleges in paragraphs 12 and 13 of his complaint that he was deprived of the benefit of his wager because he was unable to properly select the correct order of finish as a result of defendant supplying inaccurate and misleading information that horse “ I ” was not running in the race.
Plaintiff’s attempt to embellish his complaint by claiming in his affidavit thqt he had “ no choice but to rely on the information posted by the defendant” (par. 9) and that he ‘1 relied upon the defendant’s good faith in posting information ” (par. 12) is insufficient to create a cause of action.
Paragraph 4.4 of the New York City Off-Track Betting Corporation’s Official Operating Procedures, Rules and Regulations provides that ‘ ‘ The exhibiting of track, racing and betting information is solely for the convenience of the betting public, and *475 the corporation assumes no responsibility or liability for the accuracy of such information.”
Copies of these rules are available at each branch upon request. Notice of this rule is also provided on the throw-away sheets available at all branches.
In addition to the notice given concerning this rule, in Salmore v. Empire City Racing Assn. (123 N. Y. S. 2d 688, 692, 693, supra) the court stated that anyone placing a bet at a track is presumed to know the rules and to abide by them, and that all bets are subject to all the rules and regulations prescribed by the racing commission and the track.
There is no requirement, either by statute or regulation, that OTB provide any track or racing data and, therefore, it is under no duty or obligation to do so. The mere posting of such data for the convenience of the public together with a notice that OTB assumes no responsibility or liability for the accuracy of the data, cannot and does not create any additional duty on the part of the defendant with respect to said information.
Defendant, OTB, in the instant action, gave notice that it posted racing information only for the convenience of bettors and that it assumed no responsibility for its accuracy. This evidences an intention not to assume a duty to make reparation to the individual members of the public.
Defendant, in this case, owes no duty to the plaintiff or any other OTB bettor with respect to the accuracy of the information and neither plaintiff nor any other bettor is entitled to rely on the information and hold defendant liable for any mistakes therein. Defendant’s only duty would be to refrain from willful conduct in this regard.
An important fact, which plaintiff cannot deny and which must be considered in connection with every argument made by plaintiff, is that plaintiff himself made the ultimate decision to place bets on E, G, A, D and E, G, A, B in the race in question. Neither defendant, nor anyone else forced him to bet on that superfecta race at all. Plaintiff obviously placed those bets because he wanted to bet on E, Gr, A, D and E, Gr, A, B.
Therefore, plaintiff’s claim that he was required to place wagers on E, Gr, A, D and E, Gr, A, B because of misrepresentations made by defendant has no merit.
George Bernard Shaw once wrote that “ gambling promises the poor what property performs for the rich — something for nothing.” Unfortunately, bettors cannot expect and certainly do not have an absolute right or guarantee that they will win on any bet they place. Every wager is a gamble with often only a slight chance of winning. When a bettor places a wager *476 on a horse or combination of horses which loses, he cannot demand a return of his money or be given a winning payoff because he failed to bet on horses other than those he actually did select.
Thus, a correct analysis of the situation reveals that plaintiff was not deprived of any benefit of his wagers.
Defendant did nothing which interfered in any way with the possibility of horses designated by letters E, G-, A, D, or E, G-, A, B finishing first, second, third and fourth and, therefore, cannot be said to have interfered with or denied plaintiff the benefit of his wagers.
If the horses which plaintiff selected had finished in the exact order of selection then plaintiff would have held a winning ticket. This possibility or chance is the only benefit that any bettor-can claim from a wager.
One must wonder whether, if E, Gr, A, D, or E, Gr, A, B had finished the race in that exact order, plaintiff would have refused to collect payment of a winning share on the ground that he really intended to bet on E, Gr? A, I. The obvious answer demonstrates that plaintiff was not deprived of any benefits of his wagers.
In paragraphs 6 and 9 of the complaint, plaintiff uses the term “ offer ” in such a way as to attempt to create the illusion that defendant created a contractual relationship. Plaintiff, in an apparent attempt to bolster this contract theory, states in paragraph 15 of his affidavit that ‘ ‘ what the defendant actually did was make a wager and refused to pay me my winnings.”
It has been held that the placing of a wager at a racetrack does not create a wagering contract or agreement between the bettor and the track; nor does the bet exist between the bettor and the track.
In Holberg v. Westchester Racing Assn. (184 Misc. 581 [Sup. Ct., App. Term, 1st Dept., 1945]) plaintiff requested two tickets on the No. 3 horse but defendant’s teller punched out two tickets bn the No. 4 horse. Plaintiff protested but the teller refused to take back the tickets. As luck would have it, the No. 3 horse won the race.
The court declared that there is no wagering contract agreement or bet between the track (in this case OTB) and the bettor. The transaction was held to be “ between the participants in the pari-mutuel pools, the odds and terms thereof being determined by the participants according to the amount of their payments into the pool.” (supra, p. 583). (See, also, Shapiro v. Queens County Jockey Club, 184 Misc. 295, 302 [Mun. Ct. of City of N. Y., Borough of Queens, 1945].) *477 The court (p. 584) went on to describe the position of the track (or that of OTB in this case): “ The [track] does not act on personal responsibility or make or accept a wager. If it did it would violate the Penal Law. It is merely an agency legally made by statute for taking, handling and distributing the money wagered by the participants who are the parties to the wagering transaction.”
The right of a bettor was then summed up by the court when it stated that the right to a winning share does not result from buying a ticket but solely from having a ticket which evidences a bet on a winning horse (see supra, p. 586).
The instant case presents a very similar situation. In fact, the plaintiff in Holberg claimed a greater wrong than does plaintiff in the instant action because he received tickets he did not want, while plaintiff in this action did receive tickets that he wanted.
A critical weakness of the plaintiff’s case is the speculative nature of his claim for damages.
It is not enough for the alleged damages to be susceptible of calculation, as in this case, but they must be the direct, proximate and probable result of the alleged wrong, rather than left to speculation and conjecture. That requirement cannot be satisfied since the technology has not yet been devised which can establish whether or how the plaintiff might have acted other than the way in which he actually placed his wager.
For instance, in Le Herisse v. Meehan (144 App. Div. 581), where a defendant unreasonably revoked an oral license to enter his land and remove a frame building, a verdict was improper which included incidental damages allegedly incurred by plaintiff because he was prevented from erecting the house on another lot which he owned.
In an action for breach of contract to furnish two gowns to the plaintiff’s betrothed, which were agreed to be delivered before a specified day, on which the defendant had notice of the fact that the plaintiff intended to be married, damages sustained allegedly because the lady canceled her engagement by reason of the nondelivery of the dresses, together with other expenditures in connection with the wedding, were considered too speculative. (Cappola v. Kraushaar, 102 App. Div. 306.)
In Strough v. Conley (257 App. Div. 1057, app. dsmd. 283 N. Y. 631), holding that in an action against a village for failure to provide water to farm buildings and the premises of the owner pursuant to contract, a claim for damages for diminution in the amount of milk produced from the plaintiff’s dairy was too speculative and conjectural and not recoverable.
*478 In Hewlett v. Caplin (275 App. Div. 797, affd. 301 N. Y. 591) the damages of the plaintiff arising ont of breach of contract were held to be speculative and without basis for recovery where the plaintiff claimed one half of 10% of an unknown retail selling price on an unknown number of copies of a nonexistent book, and a percentage of unknown proceeds from the nonexistent sales of book rights of a book never written or published.
Annotation: Distinction between uncertainty as to whether substantial damages resulted and uncertainty as to amdunt (78 A. L. R 858).
The court is constrained to echo Benjamin Franklin’s maxims prefixed to Poor Bichard’s Almanac (1758) where he wrote: “ A little neglect may breed mischief * * * and for want of a horse the [bettor] was lost.”
Accordingly, since the complaint does not state a cause of action, the cross motion by defendant seeking its dismissal is granted and plaintiff’s motion for summary judgment is denied.